STATE OF MAINE                                      SUPERIOR COURT
KENNEBEC, ss                                        AP-10-18

MICHAEL MALUAL

v.                                                  ORDER ON RULE 80 C APPEAL

MAINE UNEMPLOYMENT SECURITY
COMMISSION

## Procedural Background

Before the Court is an appeal brought by Michael Malual of a March 11, 2010

decision of the Maine Unemployment Security Commission (hereinafter "Commission")

disqualifying Mr. Malual from receiving unemployment benefits based on his discharge

from employment for misconduct. Mr. Malual had previously been found eligible for

benefits by a deputy's decision dated August 28, 2009 as well as a Hearing Officer's

decision dated October 30, 2009. Both the deputy and the Hearing Officer found that Mr.

Malual had been discharged, but not for misconduct. The employer appealed to the

Commission, and this appeal was brought by Mr. Malual pursuant to Rule 80 C of the

Maine Rules of Civil Procedure.

Mr. Malual is represented by Attorney John H. Branson, whose first involvement

in the case was to ask for reconsideration of the Commission's March 11, 2010 decision.

1

The Commission is represented by Assistant Attorney General Elizabeth Wyman.[1] The parties orally argued this appeal on December 29, 2010. The Court has considered the oral and written arguments of the attorneys, reviewed the certified administrative record, and issues the following Order.

## Factual Background

Michael Malual worked as a direct support professional out of the Sanford, Maine office of Granite Bay Care, Inc. from March 24, 2008 until July 1, 2009. (Administrative Record, hereinafter "R" at page 5, 23.) Mr. Malual is described as having been a "great employee, very punctual, very timely." (R. at 30-31). His job was to provide in-home direct care to individuals with mental and developmental disabilities. A Maine Care regulation which came into effect after he was hired required him to obtain a high school diploma or a GED certificate in order to keep his job. (R. at 5). Maine Care, through the Maine Department of Health and Human Services, is the sole source of funding for Granite Bay. The State informed Granite Bay in the summer of 2008 that it was going to require that all of their employees provide written documentation of their level of education. (R. at 8). The parties agree that as of the date of hire, Mr. Malual had not attained the level of education required by the regulation.[2]

On August 6, 2008 Granite Bay sent a written notice to all employees advising them of this policy change. It was put in a "payroll stuffer" and was also posted in each of Granite Bay's three offices. (R. at 27). The notice indicated that employees had until

[1] Party-in-Interest, Granite Bay Care, is represented by Attorney Leah Rachin. Granite Bay notified the Court by letter dated September 1, 2010 that it joined in the arguments made by the Commission and would not be filing a separate brief.
[2] Mr. Malual previously worked for Granite Bay for an unspecified time beginning in 2006. (R. at 24).

September 12, 2008 to provide their area office with "a copy the degree/diploma/certificate of their highest level of education.' (R. at 113). The notice went on to say that the employee "should update this documentation if you obtain additional education, because that is a factor for consideration for pay increases." (R. at 113).

On September 30, 2008 Granite Bay sent another notice to employees setting a November 1, 2008 deadline to provide "documentation of the GED certification." The notice also indicated that if the employee did not pass the exam by that date, they needed to provide documentation that the test was taken and failed. Those employees were then required to retake the test by December 1, 2008, and by that date provide documentation that they had passed the test, or that they had taken the test and were awaiting results. (R. at 114).

This same notice also stated: "If such documentation is not provided by December 1, 2008 then the Program Manager is responsible for taking corrective action leading to suspension and termination of the employee for failure to meet the educational requirements of their job."

On December 2, 2008 Granite Bay received from Portland Adult Education a fax that stated that Mr. Malual was scheduled for an ESOL Intake appointment on December 15, 2008 at 4:00 pm, and indicating that Granite Bay should call if they had any questions. (R. at 104). ESOL is a program designed to teach individuals who use English as a second language, and is described in the record as "a precursor to the GED program." (R. at 73). Mr. Malual is from Africa, and many employees of Granite Bay

come from foreign countries and are members of what was described as "the refugee community." (R. at 25, 47). Mr. Malual's native language is Arabic. (R. at 134).

On March 4, 2009 Granite Bay sent Mr. Malual a certified letter stating that he had provided information to it "last fall" that he was enrolled in a GED program. He was told as well that as he was "completing the GED testing process, you must keep us informed of your progress in completing and passing the required tests." (R. at 99).

Granite Bay also received from Portland Adult Education a document indicating that he had registered as of March 24, 2009 for "ESOL 3" classes beginning April 27, 2009 and ending July 17, 2009. The document indicated that he would be going to class three days a week, from 9:00 am to 11:15 am. (R. at 105).

Heidi Johnson, Human Resource Director for Granite Bay, testified that she sent a "directive action" to Mr. Malual on June 18, 2009 which she said was to provide written notice of "what was is going on." (R. at 35). The record contains a document marked as Employer's Exh. 8 which contains two dates: June 19, 2009 at the top, and June 18, 2009 at the bottom. The form is entitled "Corrective Action" and also has a box checked indicating "1st Written Warning," although it also has (unchecked) boxes for "2nd Written Discipline" and "3rd Written Discipline." (R. at 106). She testified that it was sent registered and certified mail, and the box is so checked on the document. The form provides for the employee's response to the corrective action, as well as for a signature acknowledging receipt and review of the discipline action outlined within it. The document contains no response or signature from Mr. Malual. The form also refers to an "enclosed letter" which is not in the record. This Exhibit 8, although marked, does not seem to have been admitted at the Commission hearing, and the index to the transcript of

4

the Commission hearing does not refer to it. (R. at 20). This unadmitted document warns the employee that failure to take corrective action "could result in further disciplinary action, including termination." (R. at 106).

A deadline of July 1, 2009 was set for Mr. Malual to comply with the GED requirements. He testified that on the last day of June, 2009 he faxed further information from Portland Adult Education to the Sanford office of Granite Bay, and confirmed with Barbara, the receptionist, that Granite Bay had received it. (R. at 68).

Christine Tiernan, who worked as the area director for Region I of Granite Bay, testified that she made it clear to Mr. Malual that if he did not provide the required documentation that he would be fired. (R. at 40). She stated that Granite Bay would need to know, "basically his grades, how he was doing in class... making sure he was attending." (R. at 56). She stated that she was very worried about Mr. Malual, who she valued as an employee because he worked hard and was punctual. She stated that many Granite Bay were very attached to him. (R. at 58). It was Ms. Tiernan's job to discuss Mr. Malual's termination with him. She indicated that Kelly, the program director, was crying she was so upset. She stated they both knew that Mr. Malual had six children and they were all worried about how he would support them. (R. at 43).

Ms. Tiernan further testified that if Mr. Malual supplied the documentation as he described, it never reached "the program manager level." (R. at 63). She stated that she was certain that her office manager would have supplied the information to her since "she was really aware of where we were at as a team, she would have supplied it to us." (R. at 63).

Mr. Malual was terminated from his employment at Granite Bay by letter dated July 2, 2009. He was informed it was for "misconduct by your failure to abide by Maine regulation and company policy regarding documentation of the required level of education for DSP employment." (R. at 117).

## Standard of Review

The parties are well aware of the standard of review to which this Court must adhere in this administrative appeal. This Court is limited in this case to deciding whether the Commission "abused its discretion, committed an error of law, or made findings not supported by substantial evidence on the record." *Seider v. Bd. Of Examiners of Psychologists,* 2000 ME 206¶ 8, 762 A.2d 551, 555.

On review, the Court may reverse or modify the decision if the administrative findings, inferences, conclusions or decisions are "in violation of constitutional or statutory provisions or… unsupported by substantial evidence on the whole record; or arbitrary or capricious or characterized by an abuse of discretion." 5 MRSA §1107(4)(C).

"Misconduct" for purposes of this case is defined as "a culpable breach of the employee's duties or obligations to the employer or a pattern of irresponsible behavior, which in either case manifests a disregard for a material interest of the employer. 26 MRSA §1193(2). An "unreasonable violation of rules that are reasonably imposed and communicated and equitably enforced" is an act or omission that is presumed to manifest a disregard for a material interest of an employer. 26 MRSA §1043(23)(A)(2).

It is the employer's burden to show that an employee's conduct meets this statutory definition of misconduct. 536 A.2d 618, 619 (Me. 1988).

Mr. Malual does not challenge the reasonableness of the employer' GED requirement. (R. at 7). Rather, he alleges that when objectively viewed, his conduct was reasonable under all the circumstances of the case. *Sheink v. Maine Dept. of Manpower Affairs,* 423 A. 2d 519 (Me. 1980).

## Discussion

In its decision, the Commission found explicitly that Mr. Malual did not meet the first two deadlines set by the employer (Sept. 12, 2008 and November 1, 2008) to provide documentation showing he had passed the GED exam or that he was scheduled to retake the test if he had failed it. There is clear support for that finding on this record.

The Commission found additionally that on December 2, 2008 he was enrolled in a GED course at the Portland High School Adult Education Program. This finding is not supported by the record. Mr. Malual was not enrolled in a GED course as of that date, he was scheduled for an intake appointment for an ESOL course. The note he gave to his employer provided for a contact number in case the employer "had any questions." (R. at 104). The English proficiency course was, according to the employer's testimony, a precursor to the GED course, and was designed for individuals for whom English was not their primary language. (R. at 104).

The Commission then cites Mr. Malual's lack of action in response to the employer's March 4, 2009 letter, which had requested proof of Mr. Malual's progress in the GED course. Employer's Exh. 7, which was admitted into evidence, confirmed once

7

again that Mr. Malual was, in fact, not enrolled in a GED course, but was enrolled in what is described on that document as "ESOL 3 (M/W/F)." The exhibit shows his registration date as March 24, 2009 and indicates that the course would run from 4/27/09 to 7/17/09.( R. at 105.)

The Commission further found that Mr. Malual did have Portland High School fax, on or about June 26, 2009, a GED enrollment sheet to his employer. While the employer has maintained that they did not receive it, the Commission found that they did. (R. at 13). The Commission found, however, that the fax "did not contain any information from which the employer could determine the claimant's progress in the GED course. While it is not entirely clear how the Commission made that finding since the document was not produced by either side,  Employer's Exh. 7, as noted above, indicates that the course that Mr. Malual was pursuing at Portland High School during that time frame was not in fact a GED course. Instead, it indicates that Adult Education was still providing course work to Mr. Malual designed to increase his English proficiency, a course which Granite Bay admits was a precursor to taking the GED course. (R. at 105). The Exhibit also makes it clear that Mr. Malual would not be completing that course until the middle of July of 2009. Therefore, assuming as the Commission did, that Portland High School sent an update on Mr. Malual's educational progress on or about June 26, 2009, it can only be inferred that the Adult Education Program was updating his progress on the course described as "ESOL 3."

A review of the answers Mr. Malual provides to many questions put to him by the Commissioners suggests that the Adult Education Program's requirement that Mr. Malual increase his English proficiency before taking the GED course was appropriate and

necessary. [3] His answers or comments are at times non-responsive or only partially responsive. When asked by Chairman Peverada if he has any objection to the admission of Employer Exhibit 4 which (the Maine Care regulation), Mr. Malual indicates through the interpreter, "Yes. He has some questions." Mr. Malual then begins trying to explain, "This is not the first time I'm working for them. In 2006, when I was --- I think it was an obligation at that time to have a GED." (R. at 24).

Other answers he gives are described as "indiscernible." When asked by Chairman Peverada if he remembers talking to his supervisor about the written warning, he indicates he does not remember receiving it, but does remember talking with his supervisor about it: "She called me to say it was not (indiscernible). (Speaking in English, but indiscernible.) If you don't have it with you, you should be fine." (R. at 38).

Other parts of the proceeding are difficult to follow given the format used by the Commission and the challenges presented by the interpretive process. When Ms. Johnson is describing the process Granite Bay employed in deciding to terminate Mr. Malual, the transcript reads as follows:

> Ms. Johnson: A decision was made by (indiscernible) that we were going to terminate the people who had not provided the documentation as required, Mr. Malual being one of them. He had Exhibit 3 already entered, my July 2, 2009 letter to Mr. Malual, terminating him based on his failure to meet the requirements of the regulation and the requirements that (indiscernible). I believe it was —
>
> Interpreter: (Begins to translate.)

---

[3] Mr. Malual was pro se before the Commission. He had a live Arabic interpreter before the Commission. (R. at 23). Mr. Malual requested an interpreter before the Administrative Hearing Officer (AHO) some way into that hearing, and received assistance from Shima Kadhim for the rest of that hearing. (R. at 134-152). The employer objected to the AHO providing an interpreter, stating that "he worked for us for more than a year and had no problem communicating with the staff at this agency." (R. at 147). The name of the interpreter before the Commission was indicated as "Indiscernible." (R. at 21). Chairman Peverada in a colloquy with Heidi Johnson, the employer's representative, explains the instructions he gave the interpreter: "What he's going to do, and I talked with the interpreter and he talked to the claimant, is he's going to inquire every now and again if he understands what's going on…and explain it if he does not." (R. at 23). Neither Mr. Malual nor the Interpreter are recorded as commenting on these instruction or this procedure.

9

Chairman Peverada: Let her respond to the question, then I'll get back ---

(R. at 40)

Ms. Johnson resumes her testimony, and then the Chairman asks Mr. Malual through the interpreter: "So were you fired in person?" Mr. Malual's response, through the interpreter is indiscernible. (R. at 40)

There is no way to tell from the record whether the interpreter was ever able to interpret into Arabic Ms. Johnson's testimony set forth above. There is no way for the Court to tell if the portions of this transcript that are designated "indiscernible" are due to a poor recording or an inability on the part of the court reporter to tell what was being said by Mr. Malual or at times, other witnesses. However, in the portions of Mr. Malual's testimony that were discernible to the court reporter, his limited English skills are apparent.

When Mr. Malual begins his testimony before the Commission, it is not clear whether he has understood the testimony of Christine Tiernan who testified before he did, whether he understood the process, and whether the Commissioners were able to understand his answers. As Ms. Tiernan finishes her statement, she is told by Chairman Peverada that she should go outside. Commissioner Kelleher informs the Chairman that he believes Mr. Malual has some questions. The transcript reads as follows:

> Mr. Kelleher: I think he has a question for - -
> Chairman Peverada: Oh, I'm sorry. Thank you.
> Ms. Johnson: We (indiscernible) cross.
> Chairman Peverada: Yeah, yeah. Do you have any
> questions for this witness? Or do you have - -if you
> have testimony, I'm going to dismiss her and then you

10

can testify, but do you got any questions –

Mr. Malual: Yeah. I never been talking to Christine about the GED, no. It was the program manager.

Chairman Peverada: Okay. You're testifying. That's okay.

Mr. Malual: She was talking about she was discussing with me a GED.

Chairman Peverada: Okay.

Mr. Malual: I never (indiscernible).

(MULTIPLE SPEAKERS)

Chairman Peverada: He doesn't have to ask a question. He can go right into his testimony. I'll just have her go outside when he testifies then she may be recalled by the employer. But if he has any questions of her directly face-to-face, then ask them now. It doesn't bother me one way or the other.

Mr. Malual (through interpreter): How did you reach the conclusion that I left the job myself?

Ms. Tiernan: I didn't reach that conclusion.

Mr. Malual (through interpreter): He seems to have understood that. He left his job, and you didn't –

Chairman Peverada: He can't keep talking when you're talking, okay. you're interpreting for him, so if he keeps going ahead of you, it's not going to work, okay. All right.

Mr. Malual (through interpreter): He has an understanding that they – I left the job. I'm speaking first person, he left the job.

Chairman Peverada: And is he asking if that's what the employer believed?

Mr. Malual (through interpreter): My question to –

Chairman Peverada: Yeah.

Mr. Malual (through interpreter): -- I was surprised when I see the paper that say I left the job (indiscernible). I was surprised by that. (Indiscernible) how I loved my job.

Chairman Peverada: That's not a question to you. He's testifying.

Mr. Malual (through interpreter): Who say that I left the job?

Chairman Peverada: All right. No one is saying that you left the job voluntarily.

Mr. O'Malley: Nobody's saying that. I know what he's – he had looked he had seen that in the notice when we raised both issues. That's what it is.

Chairman Peverada: No. You were fired by the employer.

Mr. O'Malley: Yes.

Chairman Peverada: Okay.

Mr. O'Malley: No doubt.

Chairman Peverada: Nobody's question.

Mr. O'Malley: No question that you left.

Chairman Peverada: Okay. All right. Why don't you go wait outside.

Tiernan: Sure.

(R. at 63-66).

Chairman Peverada then directs questions to Mr. Malual about the timing of the notices or warnings given to him by the employer, obviously an important issue before the Commission, as follows:

> Chairman Peverada: Did Christine talk with you or your supervisor in Sanford talk with you more about the documentation - -
> Mr. Malual: After.
> Chairman Peverada: After?
> Mr. Malual: After when I come over to sign (indiscernible), they discuss it with me that day.
> Chairman Peverada: Okay.
> Mr. Malual: But before then, no.

(R. at 67)

Mr. Malual then testifies that he did have Portland Adult Education send a fax to the Sanford office, and that he confirmed with "Barbara" who told him that it went through. (R. at 67-68). He goes on to testify that the paper that was faxed "looked like this paper," although the record does not reference what document Mr. Malual is pointing to. (R. at 69). In response to a compound question regarding with whom he spoke when he was fired, and who fired him, Mr. Malual's response is, "Before or after?" (R. at 69).

Mr. Malual then describes two phone calls he received and the transcript reads further, as follows:

> Mr. Malual: It was supposed to be my supervisor. She didn't tell (indiscernible). And I say why? Because I have to discuss it with my supervisor before (indiscernible). I tell this one in the office, the one she was talking about, about the GED (indiscernible). All I get is the warning. (Indiscernible) what I'm going to do for this one. The one that you have is talking about a GED.
> Chairman Peverada: Yeah, the warning.
> Mr. Malual: Yeah. "You don't bring GED on day – you will get fired."

12

Chairman Peverada: Yeah.
Mr. Malual: I take it to my supervisor.

(R. at 71)

Upon further questioning by Chairman Peverada, Mr. Malual indicates that he was still enrolled in the ESOL class at the end of June. (R. at 74). In addition, as of the date of the January 28, 2010 hearing Mr. Malual was enrolled in the GED program. In response to questions about what course work he had taken at Adult Ed since 2008, he indicates through the interpreter that he has taken "English language, World History and World Culture, and they were supposed to start mathematics with me." (R. at 89). He also testified that he was taking some of these courses before he was terminated. (R. at 89).

Mr. Malual also testified that when he asked the person or persons he spoke with at Adult Ed and asked for information required by Granite Bay, their response was to suggest that Granite Bay contact them directly. (R. at 88). While it is not at all clear why this was their response, one has to question whether Mr. Malual was able to adequately convey to them what was needed.

The Court cites the above portions of testimony not to suggest that the Commission treated Mr. Malual unfairly, and the Court is mindful that neither party raised or argued the issue of Mr. Malual's limited English proficiency. The Court cites the testimony in order to make clear the Court's concern about certain factual findings of the Commission that are not supported by the evidence. Those findings include that Mr. Malual faxed information about the GED program before his termination, and that he unreasonably failed over a significant period of time to give Granite Bay appropriate information about the GED course. The course or courses in which he was enrolled

13

during the critical times here were language proficiency courses he needed to take before he could even begin the GED program.

The only issue before the Court, given Mr. Malual's concession about the reasonableness of the employer's GED requirement, is whether Mr. Malual's failures to meet the documentation requirements and deadlines were "unreasonable under all the circumstances." These circumstances included the facts that Mr. Malual's limited English skills necessitated his completion of a language proficiency program before he could be accepted into the GED program, and that he was therefore unable to meet the employer's otherwise reasonable deadline for completion.

The Court recognizes that the Commission was in a much better position than the Court to make credibility determinations, and this order does not question any credibility findings. The Court also does not presume to advise the Chairman on how to administer the proceedings before him. However, the Commission erred in finding that he was in a GED program, as opposed to being in a precursor class that taught English proficiency. The Commission also did not consider the fact that Mr. Malual could not enter a GED program or take and pass a GED course until his English proficiency skills improved. While the employer had no choice but to terminate Mr. Malual given the demands and deadlines placed on them by the Maine Care regulation, that is not the issue presented here. This issue is whether Mr. Malual's need to significantly delay enrollment in and completion of his GED course due to his limited English proficiency, and his consequent failure to comply with the employer's deadlines, constitute misconduct as defined under Maine employment security law.

The record does not support a finding that the employer met its burden to show the unreasonableness, or culpability, of the claimant's failure to provide evidence of his GED tests or grades. During the time frame in which the Commission found he was engaged in a GED course and not complying with the employer's request for information about his GED progress, he did provide information to his employer that showed that he was engaged in a course designed to increase his English proficiency. The ESOL course or courses were a prerequisite to the GED course, and the resultant delays made it impossible for him to meet the otherwise reasonable deadlines of his employer.

The entry will be:

> Commission Decision No. 09-C-11263 is reversed. The Petitioner was discharged from employment, but not for misconduct within the meaning of 26 MRSA § 1043(23).
>
> This order shall be noted on the docket as incorporated by reference pursuant to Rule 79(a) of the Maine Rules of Civil Procedure.

_____
**DATE**

_____
**SUPERIOR COURT JUSTICE**

15

Date Filed __5/13/10__ __Kennebec__ Docket No. __AP-10-18__
County

Action __Petition For Review__
80C

**J. Murphy**

Michael Malual                                    vs.    Maine Unemployment Insurance Commission

| | |
|---|---|
| Plaintiff's Attorney | Defendant's Attorney |
| John H. Branson, Esq.<br>PO Box 7526<br>Portland, ME  04112-7526 | — Elizabeth Wyman, AAG<br>  6 State House Station<br>  Augusta Maine 04333-0006<br>— Susan Driscoll, Esq.  (Granite Bay Care PI]<br>  Leah Rachin, Esq.<br>  62 Portland Road, Suite 25<br>  Kennebunk, Maine 04043 |

| Date of Entry | |
|---|---|
| 5/14/10 | Petition For Review Of Final Agency Action Pursuant To Rule 80C, filed 5/13/10.  s/Branson, Esq. |
| 5/19/10 | Letter entering appearance, filed. s/Wyman, AAG |
| 5/20/10 | Entry of Appearance, filed. s/Driscoll, Esq.  s/Rachin, Esq. (party-in-int) |
| 6/16/10 | Administrative Record, filed. s/Wyman, AAG<br>**NOTICE AND BRIEFING SCHEDULE ISSUED**<br>Copies to attys. of record. |
| 7/27/10 | Motion for a 7-day enlargement of time to file brief of petitioner. Filed 7/26/10 by Atty Branson. |
| 7/29/10 | Letter filed by Atty Branson regarding the motion for 7-day enlargement of petitioner filed on 7/26/10. |
| 8/3/10 | Letter filed informing the court there is no objection to the motion for enlargement of time, filed. s/Wyman, AAG. |
| 8/3/10 | Brief of Petitioner in Support of Petition for Review of Final Agency Action pursuant to Rule 80C, filed.  (8/2/10) |
| 8/9/10 | MOTION, Murphy, J.<br>BE IT HEREBY ORDERED THAT Motion for a 7-day Enlargement of Time to File Brief of Petitioner is hereby: GRANTED<br>Copies to attys. of record. |
| ------- | Party-in-Interest's Unopposed Motion to Enlarge Time to File Brief, filed.<br>Rachin, Esq.<br>Proposed Order, filed. |
| 8/11/10 | ORDER, Murphy, J.<br>This order shall be incorporated on the docket.<br>Copies to attys. of record. |

| Date of Entry | Docket No. _____ |
|---|---|
| 8/30/10 | Brief of the respondent Maine Unemployment Insurance Commission filed by Elizabeth Wyman, AAG. |
| 9/3/10 | Letter notifying the Court that PII Granite Bay, Inc. joins in the brief of Respondent Maine Unemployment Insurance Commission and will not be filing a separate brief. s/Rachin, Esq. (filed 9/2/10) |
| 12/8/10 | Oral argument scheduled for 12/29/10 at 1:30 p.m. Motion/Oral Argument list mailed to attorneys of record. |
| 5/17/11 | ORDER ON RULE 80C APPEAL, Murphy, J. (5/13/11) Commission Decision No. 09-C-11263 is reversed. The Petitioner was discharged from employment, but not for misconduct within the meaning of 26 MRSA § 1043(23). This order shall be noted on the docket as incorporated by reference pursuant to Rule 79(a) of the Maine Rules of Civil Procedure. Copy to Attorney Branson, Attorney Driscoll, AAG Wyman. Copy to repositories. |
| 5/17/11 | Notice of removal of record/exhibits mailed to all attorneys. |